Slip Op. 21-20

## UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| **IÇDAŞ CELIK ENERJI TERSANE VE ULASIM SANAYI A.S.,**<br><br>       **Plaintiff,**<br>    **and**<br><br>**ÇOLAKOĞLU METALURJI A.S. & ÇOLAKOĞLU, DIS TICARET A.S., ("ÇOLAKOĞLU")**<br><br>       **Consolidated Plaintiffs,**<br>  **v.**<br><br>**THE UNITED STATES,**<br><br>       **Defendant,**<br><br>    **and**<br><br>**REBAR TRADE ACTION COALITION,**<br><br>       **Defendant-Intervenor.** | **Before: Gary S. Katzmann, Judge**<br>**Consol. Court No. 19-00149**<br><br>***PUBLIC VERSION*** |

## OPINION

[The court sustains Commerce's Final Results and denies Plaintiffs' motion for judgment on the agency record challenging the final affirmative determination.]

Dated: <u>February 19, 2021</u>

<u>Matthew M. Nolan</u>, Arent Fox LLP, of Washington, DC, argued for plaintiff and consolidated plaintiffs. With him on the brief were <u>Leah Scarpelli</u> and <u>Natan P.L. Tubman</u>.

<u>Ann C. Motto</u>, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for defendant. With her on the brief were <u>Joseph H. Hunt</u>, Assistant Attorney General, <u>Jeanne E. Davidson</u>, Director, and <u>L. Misha Preheim</u>, Assistant Director. Of Counsel <u>Reza Karamloo</u>, Senior Attorney, Office of Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce. With them on the post argument submission was <u>Jeffrey Bossert Clark</u>, Acting Assistant Attorney General.

Consol. Court No. 19-00149                                                    Page 2
**PUBLIC VERSION**

Maureen E. Thorson, Wiley Rein, LLP, of Washington, DC, argued for defendant-intervenor. With him on the brief were Alan H. Price and John R. Shane.

Katzmann, Judge:  Under American law, to promote fair trade in the domestic market for American goods, the United States Department of Commerce ("Commerce") conducts investigations to determine whether foreign exporters and manufacturers are introducing products into the American market for below-market prices due to subsidies given by foreign governments. Commerce can offset those prices by imposing countervailing duties ("CVD").  This case presents a number of questions relating to Commerce's CVD determination regarding steel concrete reinforcing bar ("rebar") from Turkey.  Did a foreign exporter and manufacturer cooperate with Commerce's investigation to the best of its ability?  Was the manufacturer's "corrective" submission improperly rejected by Commerce?  Did that exporter and manufacturer receive benefits, in a variety of forms, constituting subsidies triggering the imposition of duties under American law?  Plaintiff Içdaş Celik Enerji Tersane ve Ulasim Sanayi A.S. ("Içdaş") and Consolidated-Plaintiff Çolakoğlu Metalurji A.S. and Çolakoğlu Dis Ticaret A.S. ("Çolakoğlu"), foreign manufacturers and exporters of steel rebar from Turkey (collectively, "Plaintiffs") have initiated this suit against Defendant the United States ("Government") to challenge these and other aspects of Commerce's final results in the administrative review of the CVD order on Steel Concrete Reinforcing Bar From the Republic of Turkey.  Steel Concrete Reinforcing Bar from the Republic of Turkey: Final Results and Partial Rescission of Countervailing Duty Administrative Review; 2016, 84 Fed. Reg. 36,051 (Dep't Commerce July 26, 2019) ("Final Results").

Commerce's investigation resulted in a final determination that imports of rebar from Turkey produced by Içdaş were appropriately subject to CVD under Section 751 of the Tariff Act

of 1930 as amended, 19 U.S.C. § 1675[1].  Final Results, 84 Fed. Reg. at 36,052; see also Issues and

Decision Mem. (Dep't Commerce July 18, 2019) ("IDM"), P.R. 323.  Commerce found that Içdaş

benefited from reduced customs duties, VAT exemptions, and access to reduced-cost natural gas

as a result of the general incentives scheme ("GIIS") program covering the construction of two

power plants by Içdaş and an affiliated company, Içdaş Elektrik.  IDM at 34–38.  Commerce

additionally determined that the GIIS program benefits received by Içdaş were contingent

liabilities subject to the International Monetary Fund ("IMF") benchmark interest rate, and found

that no usable tier-two natural gas benchmark information was available, resorting instead to a

tier-three benchmark to determine whether natural gas was provided to Çolakoğlu for less than

adequate remuneration.  Id. at 37–38; 16–21.  Finally, Commerce applied adverse facts available

("AFA") to Içdaş's reported sales denominator in response to its inaccurate reporting of its total

sales denominator.  Id. at 28–29.  Plaintiffs now appeal Commerce's Final Results.  Pls.' Mot. For

J. on the Agency R. and Supp. Opening Br. at 1–2, Feb. 14, 2020, ECF No. 26 ("Pls.' Br.").  The

Government, joined by Defendant-Intervenor Rebar Trade Action Coalition ("RTAC"), supports

Commerce's determination.  Def.'s Resp. in Opp'n to Pl's Mot. For J. on Agency R., June 11,

2020, ECF No. 32 ("Def.'s Br."); Def.-Inter. Resp. in Opp'n to Pl's Mot. For J. on Agency R.,

June 11, 2020, ECF No. 33 ("Def.-Inter.'s. Br.").

The court concludes that Commerce's determinations were in accordance with law and

based on substantial evidence.  Therefore, the court denies Plaintiffs' challenge to Commerce's

determination and sustains Commerce's Final Results.

---

[1] All citations to the United States Code are to the 2012 edition.

# BACKGROUND

## I.     *Legal Background*

The Tariff Act of 1930 was enacted to empower Commerce to address trade distortions caused by unfair economic practices.  In particular, it provides for the investigation of potential subsidization and the imposition of duties on subject merchandise.  Sioux Honey Ass'n v. Hartford Fire Ins. Co., 672 F.3d 1041, 1046–47 (Fed. Cir. 2012); see also Bebitz Flanges Works Pvt. Ltd. v. United States, 44 CIT __, __, 433 F. Supp. 3d 1309, 1314 (2020).  These CVD actions are intended to be remedial rather than punitive in nature, Chaparral Steel Co. v. United States, 901 F.2d 1097, 1103 (Fed. Cir. 1990), and it is therefore Commerce's duty to determine rates as accurately as possible, Rhone Poulenc, Inc. v. United States, 899 F.2d 1185, 1191 (Fed. Cir. 1990).

In order to impose duties under Section 701 of the Tariff Act of 1930, Commerce must first find the existence of a countervailable subsidy.  A countervailable subsidy is one which satisfies the following elements: (1) a government or public authority has directly or indirectly provided a financial contribution; (2) a benefit is thereby conferred upon the recipient of the financial contribution; and (3) the subsidy is specific to a foreign enterprise or foreign industry, or a group of such enterprises or industries.  See 19 U.S.C. § 1677(5)(A)–(B); see also 19 U.S.C. §§ 1677(5)(D)–(E), (5A).  If Commerce determines that a foreign government is providing a countervailable subsidy with respect to the manufacture, production, or export of a class or kind of merchandise imported, sold, or likely to be sold for import into the United States, and the International Trade Commission determines that an industry in the United States is materially injured or threatened with material injury thereby, Commerce is then required by statute to impose a CVD upon such merchandise equal to the amount of the net countervailable subsidy.  See 19 U.S.C. § 1677(5).

A countervailable subsidy provides a benefit where it results in the provision of goods or services for less than adequate remuneration. 19 U.S.C. § 1677(5)(E)(iv). To identify such benefit,

> [T]he adequacy of remuneration shall be determined in relation to prevailing market conditions for the good or service being provided or the goods being purchased in the country which is subject to the investigation or review. Prevailing market conditions include price, quality, availability, marketability, transportation, and other conditions of purchase or sale.

Id. In practice, Commerce applies a three-tier framework to determine the adequacy of remuneration. See 19 C.F.R. § 351.511. Under tier one, Commerce compares the actual remuneration for the provided goods and services with the market price of those goods or services within the country under investigation. 19 C.F.R. § 351.511(a)(2)(i). If Commerce cannot identify a usable market price within the country under investigation, it applies a tier two benchmark. Under tier two, Commerce compares actual remuneration with the average world market price available to purchasers in the country under investigation. 19 C.F.R. § 351.511(a)(2)(ii). If neither tier one nor tier two market prices are available, Commerce applies a tier three benchmark, and "measure[s] the adequacy of remuneration by assessing whether the government price is consistent with market principles." 19 C.F.R. § 351.511(a)(2)(iii).

To be specific to an enterprise or industry, a countervailable subsidy must exhibit either de jure or de facto specificity. See 19 U.S.C. § 1677(5A). A subsidy is de jure specific where the authority providing the subsidy, or its authorizing legislation, expressly limits access to the subsidy to an enterprise or industry. See 19 U.S.C. § 1677(5A)(D)(i). To avoid a designation of de jure specificity, the administering authority must ensure that access to the subsidy is governed by objective industry- or enterprise-neutral criteria resulting in automatic eligibility, and that the criteria for eligibility are both strictly followed and clearly set forth in the relevant official materials so as to be verifiable. See 19 U.S.C. § 1677(5A)(D)(ii). A subsidy that escapes de jure

specificity may nevertheless be designated de facto specific if one or more of the following factors

exist: (1) the actual recipients of the subsidy, whether considered on an enterprise or industry basis,

are limited in number; (2) an enterprise or industry is a predominant user of the subsidy; (3) an

enterprise or industry receives a disproportionately large amount of the subsidy; or (4) the manner

in which the authority providing the subsidy has exercised discretion in the decision to grant the

subsidy indicates that an enterprise or industry is favored over others.   19 U.S.C. §

1677(5A)(D)(iii)(I)–(IV).

In determining whether a countervailable subsidy is provided to the manufacture of the

subject merchandise, Commerce may issue questionnaires to selected mandatory respondents[2] in

order to gather information for its review.  See 19 U.S.C. § 1677f-1(c)(2).  Pursuant to 19 U.S.C.

§ 1677e, if a party fails to satisfactorily respond to Commerce's requests for "necessary

information" to calculate a dumping margin by (1) withholding requested information, (2) failing

---

[2] In CVD investigations or administrative reviews, Commerce may select mandatory respondents pursuant to 19 U.S.C. § 1677f–1(e)(2), which provides:

> If the administering authority determines that it is not practicable to determine individual countervailable subsidy rates under paragraph (1) because of the large number of exporters or producers involved in the investigation or review, the administering authority may—
>
> > (A) determine individual countervailable subsidy rates for a reasonable number of exporters or producers by limiting its examination to—
> >
> > (i) a sample of exporters or producers that the administering authority determines is statistically valid based on the information available to the administering authority at the time of selection, or
> >
> > (ii) exporters and producers accounting for the largest volume of the subject merchandise from the exporting country that the administering authority determines can be reasonably examined; or
> >
> > (B) determine a single country-wide subsidy rate to be applied to all exporters and producers.

to provide information by the submission deadlines or in the form or manner requested, (3)

significantly impeding a proceeding, or (4) providing information that cannot be verified,

Commerce shall use facts otherwise available to calculate the margin.  19 U.S.C. § 1677e(a)(2).

Where Commerce determines that a respondent has failed to cooperate, it may "use an inference

that is adverse to the interests of that party in selecting from among the facts otherwise available"

and thereby apply AFA.  19 U.S.C. § 1677e(b)(1)(A).  A respondent does not cooperate to the

"best of its ability" when it fails to "put forth its maximum effort to provide Commerce with full

and complete answers to all inquiries."  Nippon Steel Corp. v. United States, 337 F.3d 1373, 1382

(Fed. Cir. 2003).  In applying AFA, Commerce may rely on information from the initial petition,

a final determination in the investigation, a previous administrative review, or any other portion of

the administrative record.  19 U.S.C. § 1677e(b)(2); 19 C.F.R. § 351.308(c).  Thus, recourse to

AFA gives Commerce a mechanism for filling informational gaps where requested or otherwise

necessary information is not provided.  See Nippon Steel, 337 F.3d at 1381.  Although Commerce

may choose to supplement the administrative record of its own accord, the burden of creating an

adequate record, and therefore of avoiding AFA, lies with the respondent.  Nan Ya Plastics Corp.

v. United States, 810 F.3d 1333, 1337 (Fed. Cir. 2016) (citing QVD Food Co. v. United States,

658 F.3d 1318, 1324 (Fed. Cir. 2011)).

## II.     *Factual Background*

On January 11, 2018, Commerce published a notice of initiation of administrative review

of the CVD Order on rebar from Turkey covering calendar year 2016.  See Initiation of

Antidumping and Countervailing Duty Administrative Reviews, 83 Fed. Reg. 1,329, 1,334 (Dep't

Commerce Jan. 11, 2018).  Commerce limited its review to the three companies that accounted for

the largest volume of rebar exports from Turkey to the United States during the period of review,

which included Içdaş and Çolakoğlu, pursuant to Section 751 of the Tariff Act of 1930 as amended,

19 U.S.C. § 1675.  Içdaş and Çolakoğlu participated throughout the proceeding by submitting

questionnaire responses and case briefs.  See, e.g., Içdaş Celik Enerji Tersane ve Ulasim Sanayi

A.S.'s Response to Section III of the Department's CVD Questionnaire (May 14, 2018) ("Içdaş

Sec. III Resp."), P.R. 99, C.R. 84 et seq.  On December 10, 2018, Commerce issued its preliminary

determination calculating a CVD margin of 1.37 percent for Içdaş, and a CVD margin of 0.04

percent for Çolakoğlu.  Steel Concrete Reinforcing Bar from the Republic of Turkey: Preliminary

Results of Countervailing Duty Administrative Review and Intent to Rescind the Review in Part;

2016, 83 Fed. Reg. 63,472, 63,473 (Dep't Commerce Dec. 10, 2018), P.R. 297 ("Preliminary

Results"); Preliminary Issues & Decision Mem., Dec. 3, 2018, P.R. 292 ("PDM").

　　　　In the Preliminary Results, Commerce determined that Içdaş and Çolakoğlu each received

countervailable subsidies during the period of review.  With respect to Içdaş, Commerce: (1)

treated the GIIS program as a contingent liability and a grant; (2) relied on a long-term interest

rates published by the IMF to measure the benefits conferred by the contingent liabilities under

the GIIS program; and (3) determined that any benefits received by respondent's cross-owned

supplier, Içdaş Elektrik, under the GIIS program should be attributed to Içdaş.  PDM at 11, 16–19.

With respect to Çolakoğlu, Commerce preliminarily found that no usable tier-two benchmark

information was available with respect to the market price of natural gas, and resorted to a tier-

three benchmark to determine whether natural gas was provided for less than adequate

remuneration.  Commerce concluded that it could not use a tier–two market benchmark for natural

gas prices in Turkey because: (1) Russian domestic prices are distorted by the government of

Russia; (2) the government of Russia also controls export pricing because it is "the dominant

supplier of natural gas in the international market," which "enables it to leverage prices and

supplies for geopolitical purposes," and prevents export pricing from being market driven; (3)

39.5% of European Union ("EU") natural gas is supplied by Russia, so International Energy

Agency ("IEA") data is not suitable for use as a benchmark; (4) the Azerbaijani government

similarly controls the domestic gas market in Azerbaijan, so Azerbaijani gas prices are not suitable

market benchmarks; and (5) liquefied natural gas ("LNG") is not a suitable benchmark because it

is not transported in pipelines and therefore not an accurate comparison.  See PDM at 19–25.

Commerce preliminarily relied on U.S. export prices for LNG exports based on information from

the U.S. Department of Energy ("DOE") and subtracted from the monthly average price the cost

of converting natural gas to LNG.  Id. at 24–25.  After utilizing this methodology, Commerce

found that Çolakoğlu did not benefit from the provision of natural gas for less than adequate

remuneration.  Id. at 25.

    Commerce affirmed that rebar from Turkey was properly subject to CVDs in its final

determination on July 26, 2019.  See Final Results; IDM.  In addition, Commerce calculated final

CVD review margins of 2.76 percent for Içdaş and 1.82 percent for Çolakoğlu.  Final Results, 84

Fed. Reg. at 36,052.  To reach these margins, Commerce applied a tier-three benchmark to measure

adequacy of remuneration, but adjusted IEA natural gas prices to account for Russian export prices

after determining that BOTAS's natural gas prices were not consistent with market principles.

PDM at 24; see IDM at 16–17.  Commerce then relied upon the adjusted IEA data as a benchmark

for natural gas prices in the Final Results.  IDM at 20.  At verification, Commerce also discovered

that Içdaş failed to report its sales figures on an accurate free-on-board ("FOB") basis.  IDM at 2,

6–7, 26–29.  Because of this failure, Commerce concluded that Içdaş failed to cooperate to the best

of its ability.  IDM at 6–7.  Therefore, in the Final Results, Commerce applied AFA to Içdaş's

sales denominator for failure to accurately report the total sales denominator, including electricity,

which Commerce concluded "rendered Içdaş's reported total sales denominator for 2016 unverifiable."  IDM at 6.  In addition, Commerce found the GIIS program benefits received by Içdaş Elektrik to be countervailable, id. at 35, and determined that investment incentive benefits received were contingent liabilities subject to the IMF benchmark interest rate.  Id. at 34, 37.  On February 14, 2020, Plaintiffs filed a Rule 56.2 motion for judgment on the agency record, arguing that Commerce's findings regarding Plaintiffs were unsupported by substantial evidence, abused Commerce's discretion, and were not in accordance with law.  Pls.' Br.  The Government and RTAC filed their response briefs to Plaintiffs' motion on June 11, 2020.  Def.'s Br.; Def.-Inter.'s Br.  Plaintiffs replied on July 9, 2020.  Reply Br. of Pls. to Def. and Def.-Inter.'s Resp. to Pls.' Mot. for J. on Agency R., ECF No. 36 ("Pls.' Reply").  Oral argument was held on November 17, 2020.  Oral Arg., ECF No. 48.  Prior to oral argument, the court issued and the parties responded to questions regarding the case.  Letter re: Questions for Oral Arg., Nov. 6, 2020, ECF No. 42; Pls.' Resp. to Ct.'s Questions for Oral Arg., Nov. 13, 2020, ECF No. 45 ("Pls.' Suppl. Br."); Def.'s Resp. to Ct.'s Order, Nov. 13, 2020, ECF No. 46 ("Def.'s Suppl. Br."); Resp. to Oral Arg. Questions of Def.-Inter. RTAC, Nov. 13, 2020, ECF No. 43 ("Def.-Inter.'s Suppl. Br.").  Following oral argument, the parties submitted additional briefing on the issues.  Pls.' Suppl. Post-Arg. Submission, Nov. 19, 2020, ECF No. 50 ("Pls.' Post-Arg. Br."); Def.'s Conf. Post-Arg. Submission, Nov. 19, 2020,  ECF No. 53 ("Def.'s Post-Arg. Br."); Post-Arg. Submission of Def.-Inter. RTAC, Nov. 19, 2020, ECF No. 51 ("Def-Inter.'s Post-Arg. Br.").

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction over this action pursuant to 28 U.S.C. § 1581(c) and 19 U.S.C. § 1516a(a)(2)(B)(iv) and (vi).  The standard of review is set forth in 19 U.S.C. § 1516a(b)(1)(B)(i): "[t]he court shall hold unlawful any determination finding or conclusion found . . . to be

Case 1:19-cv-00150-GSK   Document 27   Filed 02/19/21   Page 11 of 36

Consol. Court No. 19-00149                                                    Page 11
*PUBLIC VERSION*

unsupported by substantial evidence on the record, or otherwise not in accordance with law." Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consol. Edison Co. v. NLRB, 305 U.S. 197, 217 (1938).   Nevertheless, prior to "review by the court of the merits of a given claim, a party challenging agency action must have first exhausted its administrative remedies or demonstrated to the court that it should be exempted from the exhaustion requirement." Luoyang Bearing Corp. v. United States, 44 CIT __, __, 450 F. Supp. 3d 1402, 1408 (2020); see Boomerang Tube LLC v. United States, 856 F.3d 908, 912 (Fed. Cir. 2017).  Finally, while the court affords deference to Commerce's policy changes under Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837 (1984), Commerce must nevertheless provide an "adequate explanation" for changes or reversals in policy coming before the court.  See SKF USA Inc. v. United States, 630 F.3d 1365, 1373 (Fed. Cir. 2011).

## DISCUSSION

The court finds that Commerce's final determination was in accordance with law and supported by substantial evidence.  In particular: (1) Commerce permissibly applied partial AFA in response to Içdaş's failure to cooperate with Commerce's investigation to the best of its ability; (2) Commerce reasonably attributed to Içdaş the GIIS program benefits received by Içdaş Elektrik as a cross-owned input supplier; (3) Commerce reasonably interpreted Içdaş's customs duty and VAT exemptions as both a grant and a contingent liability; (4) Commerce's application of an IMF TL loan interest rate benchmark with respect to the GIIS's interest-free contingent liability was appropriate under 19 U.S.C. § 1677(5)(E); and (5) Commerce permissibly resorted to a tier-three benchmark for the market price of natural gas in its assessment of adequate remuneration.

> ### I.      *Commerce's Application of Partial AFA Pursuant to 19 U.S.C. § 1677e(a)(2)(C) is Supported by Substantial Evidence and in Accordance with Law*

Plaintiffs argue that Commerce's application of partial AFA was contrary to law and unsupported by substantial evidence.  Pls.' Br. at 2.  Plaintiffs assert that Içdaş acted "to the best of its ability to comply with Commerce's requests and provided all information necessary for Commerce to calculate an accurate subsidy rate," and that any inaccuracy in Içdaş's reporting of sales values on an FOB basis does not rise to the level of noncompliance.  Id. at 2, 17.  The Government and RTAC argue that Içdaş's submission of incomplete and inaccurate sales data constitutes a failure to comply with Commerce's requests to the best of its ability, and thus justifies application of partial AFA.  Def.'s Br. at 8–10;  Def-Inter.'s Br. at 6–9.  The court finds that Commerce's application of partial AFA was reasonable given Içdaş's failure to carry its burden, and Commerce's resultant inability to verify Içdaş's submissions.

Commerce applied AFA in its Final Results in response to "Içdaş' failure to accurately report the sales denominator in its questionnaire response."  IDM at 6.  Içdaş's proposed correction indicated that it "inadvertently failed to include several product categories when attempting to derive a total FOB sales figure."  Id.  However, Içdaş did not identify or correct its error during the review process -- rather, Commerce discovered the omission at verification.  Id.  Finding that Içdaş's omission of the accurate FOB sales data resulted in exclusion of "critical information required for [the] subsidy analysis" from the record, and further finding that "Içdaş had ample opportunity to report an accurate sales denominator . . . yet failed to do so," Commerce concluded that the application of AFA with respect to the sales denominator was warranted.  Id. at 6–7.

Içdaş argues that it did not fail to report sales on an FOB basis.  Pls.' Suppl. Br. at 2.  It claims that it explained that the trial balance accounts are provided in the reconciliation worksheet, while in the accounting system sales are broken out between domestic sales [[       ]] accounts,

export sales [[        ]] accounts and other sales [[        ]] accounts with sales further broken down

into product families or other grouping within each three-digit account.  Pls.' Br. at 12–13; <u>see</u>

<u>also</u> CVD–12, P.R. 99, C.R. 84.  Içdaş further argues that it provided to Commerce a detailed

description explaining the accounting process and how its data are processed and organized.  Pls.'

Br. at 13; <u>see also</u> Içdaş Sec. III Resp. at CVD–12–CVD–13, P.R. 99, C.R. 84.  Plaintiffs admit

that "certain FOB value amounts were inadvertently not carried over to the total value column

(AN) in the exhibit due to a clerical error," but claim that the correct amounts were nevertheless

reported, and simply incorrectly summed.  Pls.' Br. at 14.  In addition, Içdaş claims that it sought

to rectify its error at the first possible opportunity by submitting a corrected summation, and by

requesting that Commerce rely upon the total sales value reported in the table, including those not

included in the Total Value column.  <u>See</u> Içdaş Verification Report at 6–7, P.R. 312, C.R. 464;

Pls.' Br. at 14; Çolakoğlu and Içdaş Case Brief at 2 (June 17, 2019), P.R. 315, C.R. 466.

  The Government asserts that Içdaş's error constitutes a failure to provide information by

the deadline and in the manner requested by Commerce.  19 U.S.C. § 1677e(a)(2); Def.'s Br. at

10; <u>see</u> <u>Nippon Steel</u>, 337 F.3d at 1381.  The Government and RTAC note that the company did

not acknowledge its mistake until Commerce attempted to replicate Içdaş's reported sales at

verification and expressly identified the error.  Def.'s Br. at 11; Def-Inter.'s Br. at 2; Içdaş

Verification Report at 6–7.  In addition, the Government states that because Içdaş had to manually

deduct freight expenses from its total sales, it was impossible for Commerce to find the correct

FOB value from the information presented.  Def.'s Post-Arg. Br. at 2–5.  Içdaş's failure to provide

accurate data therefore prevented Commerce from determining the accuracy and verifying the

validity of its submissions.  <u>See</u> Def.'s Br. at 10; IDM at 6, 27–28.  Because Commerce could not

verify the validity of the reported numbers, the Government concludes, it properly resorted to

AFA.  Def.'s Br. at 10; IDM at 27–28; see also Universal Polybag Co., Ltd. v. United States, 32

CIT 904, 907, 577 F. Supp. 2d 1284, 1289 (2008).

The burden of creating an accurate record before Commerce falls to Içdaş.  See Ta Chen

Stainless Steel Pipe, Inc. v. United States, 298 F.3d 1330, 1336 (Fed. Cir. 2002).  Although a party

may avoid application of AFA by making an "effort to provide Commerce with full and complete

answers" and ensuring it does "the maximum it is able to do" to comply with Commerce's requests,

this flexible standard does not grant parties *carte blanche* for noncompliance.  Nippon Steel, 337

F.3d at 1382.  If a party determines prospectively that it is "unable to submit the information

requested in the requested form and manner," it must promptly notify Commerce, and provide a

"full explanation and suggested alternative forms" for the submission.  19 U.S.C. § 1677m(c)(1).

Furthermore, while "[c]ompliance with the 'best of its ability' standard . . . does not require

perfection and recognizes that mistakes sometimes occur, it does not condone inattentiveness,

carelessness, or inadequate record keeping."  Dongtai Peak Honey Indus. Co., Ltd. v. United

States, 777 F.3d 1343, 1355 (Fed. Cir. 2015) (quoting Nippon Steel, 337 F.3d at 1382); see also

Def-Inter.'s Br. at 8.  Indeed, the "failure of a respondent to furnish requested information -- for

any reason -- requires Commerce to resort to other sources of information to complete the factual

record on which it makes its determination," and should not be taken lightly.  Yantai Timken Co.,

Ltd. v. United States, 31 CIT 1741, 1756, 521 F. Supp. 2d 1356, 1372 (2007) (citing Nippon Steel,

337 F.3d at 1381).

As the Government notes, the Federal Circuit's decision in Nippon Steel is instructive.  In

that case, the court held that that by failing to exert "maximum effort to provide Commerce with

full and complete answers to all inquiries in an investigation," a respondent fails to act to the best

of its ability.  337 F.3d at 1382.  The court noted that the 19 U.S.C. § 1677e(b) "requires a factual

Case 1:19-cv-00150-GSK   Document 27   Filed 02/19/21   Page 15 of 36

Consol. Court No. 19-00149                                                                  Page 15
*PUBLIC VERSION*

assessment of the extent to which a respondent keeps and maintains reasonable records and the degree to which the respondent cooperates in investigating those records and in providing Commerce with the requested information." Id. at 1383.  In particular, respondents are expected to "take reasonable steps to keep and maintain full and complete records" in anticipation of possible production requests, and to "conduct prompt, careful, and comprehensive investigations of all relevant records" upon receiving an inquiry from Commerce. See id. at 1382.

Içdaş failed to meet the standard set forth in Nippon Steel.  Commerce asked Içdaş numerous times -- at least three times -- to provide an FOB basis for the total sales value.  Içdaş failed to do so.  While Içdaş claims it provided all necessary information to Commerce in its original submission and that its subsequent adjustment to the total sales value was merely a corrective summation, Commerce found that Içdaş's correction would increase the company's reported figures by nearly 50 percent.  Def.'s Br. at 11–12; IDM at 27.  Furthermore, as the Government notes, if Commerce had transferred the values in the sales column to the FOB column at Içdaş's request, it would have been forced to accept "at face value, without verification, Içdaş's statement that no freight costs needed to be added or subtracted from the reported sales."  Def.'s Br. at 12.  Under the circumstances, Commerce reasonably concluded that Içdaş failed to cooperate to the best of its ability by exerting "maximum effort to provide Commerce with full and complete answers" to its inquiries.  Nippon Steel, 337 F.3d at 1382; IDM at 28; Def.'s Br. at 11.

Indeed, courts have consistently found that application of AFA is appropriate under these circumstances.  In Dongtai Peak Honey Indus. Co., Ltd. v. United States, the Federal Circuit found that "[i]n selecting an AFA rate, Commerce may use information from the petition, investigation, prior administrative reviews, or 'any other information placed on the record.'"  777 F.3d 1343, 1355 (Fed. Cir. 2015) (citing 19 U.S.C. § 1677e(b)(2)(D)).  "[W]here there is useable information

of record but the record is incomplete," and Commerce determines that "the respondent did not cooperate to the best of its ability," Commerce applies partial AFA: "adverse inferences about the missing information." Wash. Int'l Ins. Co. v. United States, 33 CIT 1023, 1035 n.18 (2009); Yantai, 31 CIT at 1746–48, 521 F. Supp. 2d at 1364–65, aff'd 300 Fed. Appx. 934 (Fed. Cir. 2008). In Nippon Steel, the court held that "[i]t is not an excuse that the employee assigned to prepare a response does not know what files exist, or where they are kept, or did not think—through inadvertence, neglect, or otherwise to look beyond the files immediately available." 337 F.3d at 1383.

Commerce therefore reasonably applied AFA in response to Içdaş's inaccurate submissions. Commerce is required to verify all information it relies upon in making a final determination in an investigation, 19 U.S.C. § 1677m(i), and is prohibited from relying on unverified information. Yantai, 31 CIT at 1762, 521 F. Supp. 2d at 1376. Nor is the inadvertent nature of Içdaş's error an excuse. Pls.' Br. at 14; Nippon Steel, 337 F.3d at 1383. Because Commerce could not verify Içdaş's corrective information due to Içdaş's own failure to cooperate, it was prohibited from relying on the corrective submissions. Accordingly, as the Government asserts, Içdaş denied the agency the opportunity to consider the accuracy and verify the validity of the FOB sales value numbers, which are an essential component of Commerce's subsidy analysis. Def.'s Br. at 10. Recourse to AFA allowed Commerce to fill the resultant gap in its investigation. In sum, Içdaş's failure to provide the requested information -- information it had access to and could have supplied -- adequately establishes that Içdaş did not cooperate with Commerce's investigation to the best of its ability and supports Commerce's application of partial AFA. Def.'s Br. at 10.

### A.    Içdaş's Corrections were neither Clerical nor Timely

The court also rejects Plaintiffs' contention that Commerce abused its discretion by refusing to consider Içdaş's corrective submissions.  Commerce is generally prohibited form considering untimely new factual information under 19 C.F.R. §351.302(d).  Although it is Commerce's practice to accept "minor corrections to the information already on the record" at verification, this practice does not extend to major, substantive alterations.  <u>Letter from M. Hoadley to Içdaş, re: Verification Agenda for the Countervailing Duty Investigation of Steel Concrete Reinforcing Bar from the Republic of Turkey at 2 (Apr. 23, 2019) (emphasis added), P.R. 307, C.R. 452</u>.  Although Içdaş argues that its error was only "clerical" and that Commerce must therefore incorporate its correction, the court finds that Commerce's interpretation of the error as substantive, and its consequential rejection of the corrective submissions, was not an abuse of discretion.  Pls.' Br. at 19; Def.'s Br. at 15; Def-Inter.'s Br. at 12; IDM at 7 and 27.

Under limited circumstances, parties to a CVD investigation may supplement or correct the information they have provided to Commerce.  If parties under investigation wish to provide new factual information,[3] Commerce's regulations provide specific time limits for submission

---

[3] Under 19 C.F.R. § 351.102(b)(21), "factual information" means:

> (i) Evidence, including statements of fact, documents, and data submitted either in response to initial and supplemental questionnaires, or, to rebut, clarify, or correct such evidence submitted by any other interested party;

> (ii) Evidence, including statements of fact, documents, and data submitted either in support of allegations, or, to rebut, clarify, or correct such evidence submitted by any other interested party;

> (iii) Publicly available information submitted to value factors under § 351.408(c) or to measure the adequacy of remuneration under § 351.511(a)(2), or, to rebut, clarify, or correct such publicly available information submitted by any other interested party;

based on the type of information involved.  19 C.F.R. § 351.301(c).  Relevant to this dispute,

miscellaneous new factual information must be submitted either thirty days before the scheduled

date of the preliminary results or fourteen days before verification, whichever is earlier.  Id.

Beyond new factual information, "Commerce is free to correct any type of importer error --

clerical, methodology, substantive, or one in judgment -- in the context of making an antidumping

duty determination, provided that the importer seeks correction before Commerce issues its final

results and adequately proves the need for the requested corrections."  Timken U.S. Corp. v. United

States, 434 F.3d 1345, 1353 (Fed. Cir. 2006).  The court has clarified that Commerce abuses its

discretion by rejecting "corrective information," which includes submissions "to correct

information already provided [to Commerce]," Fischer S.A. Comercio v. United States, 34 CIT

334, 348, 700 F. Supp. 2d 1364, 1376 (2010), or to "clarif[y] information already in the record,"

id. at 1373, but not submissions proffered to "fill [] gap[s] caused by [the respondent's] failure to

provide a questionnaire response or evidence requested during verification."  Id. at 1377.

Nevertheless, Commerce retains broad discretion when deciding whether to accept a

respondent's corrective information.  Deacero S.A.P.I. de C.V. v. United States, 42 CIT __, __,

353 F. Supp. 3d 1303, 1309 (2018).  The court may only intervene if Commerce's rejection of

supplemental information constitutes an arbitrary abuse of its discretion, such that Commerce

"acted differently in this case than it has consistently acted in similar circumstances without

---

(iv) Evidence, including statements of fact, documents and data placed on the record by the Department, or, evidence submitted by any interested party to rebut, clarify or correct such evidence placed on the record by the Department; and

(v) Evidence, including statements of fact, documents, and data, other than factual information described in paragraphs (b)(21)(i)–(iv) of this section, in addition to evidence submitted by any other interested party to rebut, clarify, or correct such evidence.

reasonable explanation." Consol. Bearings Co. v. United States, 348 F.3d 997, 1007 (Fed. Cir.

2003) (see also RHP Bearings v. United States, 288 F.3d 1334, 1347 (Fed. Cir. 2002)).   In

particular, the court has found abuse of discretion where Commerce "refus[es] to accept updated

data when there [i]s plenty of time for Commerce to verify or consider it." Papierfabrik August

Koehler SE v. United States, 843 F.3d 1373, 1384 (Fed. Cir. 2016) (citing NTN Bearing Corp. v.

United States, 74 F.3d 1204, 1207–08 (Fed. Cir. 1995)).

       As Plaintiffs correctly note, courts have consistently held that Commerce abuses its

discretion where it denies corrections involving "a 'straightforward mathematical adjustment' that

'would neither have required beginning anew nor have delayed making the final determination.'"

Fischer, 34 CIT at 347 (quoting Timken U.S. Corp. v. United States, 434 F.3d 1345, 1353 (Fed.

Cir. 2006)); see also NTN Bearing, 74 F.3d at 1208.  Such corrections have included the deletion

of four accidentally-included foreign sales, NTN Bearing, 74 F.3d at 1208; the correction of 23

mistyped item codes, id. at 1207–08; and the submission of missing pages from a sales agreement,

Fischer, 34 CIT at 349.  In each of these cases, supporting documentation was also provided which

"establish[ed] the clerical nature of the[] errors." NTN Bearing, 74 F.3d at 1208; see also Fischer,

34 CIT at 348.

       Plaintiffs err, however, in describing Içdaş's corrective submission as a straightforward

mathematical adjustment.  Unlike plaintiffs in NTN Bearing and Fischer, Içdaş reported zeros in

the FOB column for numerous full categories of sales.   See IDM at 27.  Furthermore, its

explanation for the error was contradicted by the record. Id.  Far from being a straightforward

adjustment, Commerce determined that the proposed correction would affect a significant portion

of the data by increasing the provided sales denominator by almost 50 percent.  IDM at 7 and 27.

The correction requested by Içdaş would also require Commerce to manually deduct freight costs

from Içdaş's total gross sales, something Commerce could not do because its requested data was missing from the record.  Def.'s Suppl. Br. at 4–5.

Nor is it clear that incorporating Içdaş's correction would "neither have required beginning anew nor have delayed [a] final determination."  Fischer, 34 CIT at 347 (quoting Timken U.S. Corp. v. United States, 434 F.3d 1345, 1353 (Fed. Cir. 2006)).  Where plaintiffs in NTN Bearing or Fischer submitted corrections prior to verification, Içdaş sought to correct its mistake substantially later in the proceedings, after Commerce discovered the error at verification.  Def.'s Br. at 17.  As Commerce stated in its determination, "[w]hat amounts to a brand-new sales denominator should have been submitted early enough in the review to allow Commerce and the petitioner adequate time to consider the accuracy of the numbers involved, as well as the calculation methodology, and then give Commerce sufficient time to verify the validity of those numbers."  IDM at 27.  If Içdaş had timely submitted its corrections, then "Commerce would have had an opportunity to review and verify its validity."  IDM at 7.

The Federal Circuit has previously rejected a bright-line rule obligating Commerce to allow a respondent to correct any error, and this court similarly rejects such a holding here.  Timken, 434 F.3d at 1353.  In this case, Commerce asked Içdaş numerous times for the FOB values information, yet Içdaş either refused or failed to provide that information.  Nor could Commerce verify Içdaş's corrective submission because of Içdaş's failure to provide the information Commerce requested. Forcing Commerce to accept Içdaş's delayed correction after its failure to cooperate would render Commerce's deadlines meaningless and disincentivize cooperation with agency requests.  Def.'s Br. at 18; Def.-Inter.'s Br. at 9.  The court therefore rejects Içdaş's contention that Commerce abused its discretion by refusing to consider the corrective submission and reiterates that Commerce acted reasonably in resorting to AFA.

> **II.      *Commerce's Attribution of GIIS Program Benefits Received by Içdaş Elektrik to Içdaş is Supported by Substantial Evidence and in Accordance with Law***

Plaintiffs assert that Commerce incorrectly attributed GIIS program benefits received by Içdaş Elektrik to Içdaş because the electricity input was not dedicated to the production of subject merchandise, but rather to unrelated electricity generation. Pls.' Br. at 19–20.  While not disputing Commerce's cross-ownership determination with respect to Içdaş Elektrik, Plaintiffs claim that, despite cross-ownership, the record shows that Içdaş Elektrik sold no power to the Içdaş steel mill and the exemptions granted to Içdaş Elektrik under the GIIS program were tied to non-subject merchandise and "bestowed" for purposes of electricity production. Id. at 20.  The Government and RTAC contend that Içdaş Elektrik provided scrap, an input primarily dedicated to the production of the subject merchandise, to Içdaş. Def.'s Br. at 28; Def-Inter.'s Br. at 11.  The Government also argues that Commerce identifies the type and monetary value of the subsidy at the time of bestowal. Id. at 30.  The court finds that Commerce's attribution of the GIIS program benefits received by Içdaş Elektrik to Içdaş was supported by substantial evidence and in accordance with law.

Commerce interpreted 19 U.S.C. § 1677(5)(E) through specific regulations governing the calculation and attribution of subsidy benefits.  One such regulation, 19 C.F.R. § 351.525(a), provides that, in calculating ad valorem subsidy rates, Commerce will "divid[e] the amount of the benefit allocated to the period of investigation or review by the sales value during the same period of the product or products to which [Commerce] attributes the subsidy under paragraph (b)." Paragraph (b) identifies various rules for the attribution of subsidies, including that, where "production of the input product is primarily dedicated to production of the downstream product, [Commerce] will attribute subsidies received by the input producers to . . . both corporations."  19 C.F.R. § 351.525(b)(6)(iv).

However, subparagraph (b)(5)(i) states that "[i]f a subsidy is tied to the production or sale of a particular product, [Commerce] will attribute the subsidy only to that product."  19 C.F.R. § 351.525(b)(5)(i); see, e.g., Nucor Corp. v. United States, 44 CIT __, __, 461 F. Supp. 3d 1374 (2020); Uttam Galva Steels Ltd. v. United States, 44 CIT __, __, 425 F. Supp. 3d 1366, 1369 (CIT 2020).  Furthermore, the preamble to Commerce's CVD regulations clarifies that, while there is no "all-encompassing definition of 'tied,'" the rules regulating tied subsidies are intended to "reasonably attribute[e] the benefit from a subsidy based on the stated purpose of the subsidy or the purpose we evince from record evidence at the time of bestowal."  See Countervailing Duties, 63 Fed. Reg. 65,348, 65,403 ("CVD Preamble").

Içdaş acknowledged in the investigation that its affiliate Içdaş Elektrik was involved in the manufacture, distribution, and sale of subject merchandise during the relevant period of review. See PDM at 3, 9–10.  Specifically, Içdaş Elektrik provided scrap -- an input primarily dedicated to the production of the subject merchandise -- to Içdaş.  *See* Içdaş Celik Enerji Tersane ve Ulasim Sanayi A.S.'s Response to the Department's Section III CVD Questionnaire Identifying Affiliated Parties at 4 (Apr. 10, 2018), P.R. 36, C.R. 5.  After receiving this disclosure, Commerce preliminarily determined that Içdaş Elektrik was a cross-owned supplier and satisfied the criteria enumerated in the agency's regulation.  PDM at 9–10 (citing 19 C.F.R. § 351.525(b)(6)(iv), (vi)). Thus, Commerce preliminarily attributed the benefits received by Içdaş Elektrik under the GIIS program to Içdaş.  PDM at 16–19.  Commerce made no changes in its analysis before the Final Results besides revising Içdaş's sales denominator to apply partial AFA.  IDM at 34–35.

Içdaş contests this finding, arguing that that Içdaş Elektrik only sold a small amount of scrap to Içdaş for [[          ]] Turkish Lira ("TL"), accounting for [[          ]] of the total [[              ]] TL in raw material costs incurred by Içdaş in 2016, an amount which would

not support a finding of material input support.  Pls.' Br. at 21; Pls.' Suppl. Br. at 12.  In addition,

Plaintiffs state that while Içdaş Elektrik also sold a small amount of electricity to Içdaş [[

                                                  ]], these electricity sales were to the Içdaş concrete plant,

which is unrelated to the production of the subject merchandise.  Id. at 22.  Plaintiffs conclude that

these sales were not sufficient to attribute the "entire [Içdaş Elektrik] investment certificate

support" to the steel-making operation under investigation by Commerce.  Id. at 22.

        The Government argues that the quantity of scrap provided to Içdaş by Içdaş Elektrik is

irrelevant to Commerce's analysis because there is no threshold for the amount of input supplied

by a cross-owned company for purposes of attribution under 19 C.F.R. § 351.525(b)(6)(iv).  Def.'s

Br. at 30; see also IDM at 35.  With respect to the GIIS program, the GOT indicated during the

investigation that the program was intended to support investments in the country and to increase

employment and exports.  Def.'s Br. at 29 (citing Memorandum re: Verification of Questionnaire

Responses Submitted by the Government of the Republic of Turkey at 6 (June 6, 2019), P.R. 314,

C.R. 465 ("GOT Verification Report")).  Based on record evidence of the subsidy at the time of

bestowal, Commerce concluded that the exemptions were not specifically intended to benefit the

production of non-subject merchandise only.  Id.; IDM at 34 & nn. 204–05.  Thus, the Government

argues, it would be inconsistent with Commerce's regulations to base its determination the quantity

of electricity Içdaş Elektrik sold to Içdaş for production of the subject merchandise because it

would require Commerce to conduct its analysis beyond the time of bestowal.  Def.'s Br. at 30

(citing TMK IPSCO v. United States, 41 CIT __, __, 222 F. Supp. 3d 1306, 1325 (2017)).

        The court finds that Commerce's determination was supported by evidence and in

accordance with law.  It is well-settled that Commerce is not required to examine the ultimate use

of the subsidy.  Fabrique de Fer de Charleroi, SA v. United States, 25 CIT 567, 576, 166 F. Supp.

2d 593, 603 (2001).  Nor do Plaintiffs identify any case or statute that requires Commerce to

consider the quantity of scrap provided to a downstream producer.  See Pls.' Br. at 21–22.  While

the final quantity may be low, the regulations do not obligate Commerce to measure the impact of

an input supplier's contributions when weighing whether to attribute its subsidies to the

downstream producer.   Rather, viewed in light of the CVD Preamble, 19 C.F.R. §

351.525(b)(6)(iv) looks only at the purpose of the subsidy at the time of bestowal.  See 63 Fed.

Reg. at 65,403.  Therefore, the quantity of the scrap provided to Içdaş by Içdaş Elektrik, while low,

is not sufficient to persuade the court that Commerce acted without substantial evidence or

contrary to law.

      Nor is the court compelled by Plaintiffs' argument that because any benefit to Içdaş

Elektrik was shared by all Içdaş affiliates, it is appropriate to allocate the subsidy to overall sales.

Pls.' Br. at 23.  In fact, as the Government notes, Commerce properly attributed subsidies received

by Içdaş Elektrik to the combined sales of the input and downstream products by both corporations,

as Içdaş Elektrik is an input supplier rather than a holding or parent company.  Def.'s Br. at 32; 19

C.F.R. § 351.525(b)(6).   Commerce's methodology was reasonable: from the start of the

investigation, Commerce relied on Içdaş's supplemental questionnaire responses, and combined

the total sales of both companies while excluding all sales to affiliates.  See PDM at 3, 9–10; IDM

at 34.  Only after applying partial AFA did Commerce change its analysis, and then only to adjust

Içdaş's sales denominator.  IDM at 34–35.  Thus, Plaintiffs' argument is insufficient to overturn

Commerce's determination.

      In addition, the court rejects Plaintiffs' attempt to challenge Commerce's conclusion on the

basis that it is inconsistent with Commerce's 2015 determination that the investment certificate

granted to Içdaş Elektrik was tied to the production of non-subject merchandise.  Pls.' Br. at 21–

22; see also Çolakoğlu and Içdaş Case Br. at 11–12.[4]  The Government correctly notes that Commerce's conclusions from earlier segments of the same proceeding do not serve as precedent controlling its conclusions in a future review.  Def.'s Br. at 31 (citing Pakfood Pub. Co. Ltd. v. United States, 34 CIT 1122, 1138, 724 F. Supp. 2d 1327, 1345 (2010); IDM at 35)).  Even so, courts "look for a reasoned analysis or explanation" from Commerce to ensure that the agency has not abused its discretion in departing from prior analysis.  Wheatland Tube Co. v. United States, 161 F.3d 1365, 1369–70 (Fed. Cir. 1998) (citing Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 167–68 (1962)).  Commerce has provided such an explanation here, noting that the GOT stated during the course of Commerce's investigation that "the purpose of the customs duty and VAT exceptions provided under the GIIs is to encourage general investments in the country." IDM at 34 (citing GOT Verification Report at 6).  Where admissions from the GOT and Plaintiffs themselves evince an untied subsidy, Commerce does not abuse its discretion in departing from even an explicit contrary finding where those admissions were not available.  Id.; see also Def.'s Suppl. Br. at 9.

Accordingly, the court concludes that there is no indication that Commerce's application of 19 C.F.R. § 351.525(b) was either unlawful or unsupported by substantial evidence.

### III.     *Commerce's Decision to Treat the GIIS Program as a Contingent Liability and a Grant is Supported by Substantial Evidence and in Accordance with Law*

Plaintiffs argue that Commerce's decision to treat the GIIS program as both a contingent liability and a grant essentially "double-counted" the subsidy provided for the purchase and import of equipment.  Pls.' Br. at 23–24.  Plaintiffs additionally claim that it was factually incorrect and

---

[4] Plaintiffs point to the 2015 review: Steel Concrete Reinforcing Bar from the Republic of Turkey: Preliminary Results and Intent to Rescind Review in Part; 2015, 82 Fed. Reg. 57,574 (Dep't Commerce Dec. 6, 2017).

impermissible for Commerce to treat the GIIS as a contingent liability given that the benefits received were not "contingent" on any subsequent event. Id.  Instead, Plaintiffs contend, once the covered equipment was imported, the grant was received. Id. at 24.  The Government and RTAC disagree, arguing that Içdaş Elektrik received two benefits: a contingent liability interest-free loan in the amount of the unpaid interest on its subsidized equipment purchases, and a grant consisting of the total amount of waived duties. Def.'s Br. at 18; Def-Inter.'s Br. at 12.  The court finds that Commerce's decision to treat the GIIS program as a contingent liability and a grant was not impermissible double-counting and is in fact supported by substantial evidence and in accordance with law.

Commerce's treatment of contingent liabilities is prescribed by C.F.R. § 351.505.  The statute finds that a benefit "exists to the extent that the amount a firm pays on the government-provided loan is less than the amount the firm would pay on a comparable commercial loan(s) that the firm could actually obtain on the market." 19 C.F.R. § 351.505(a)(1).  "When 'the repayment obligation is contingent upon the company taking some future action or achieving some goal in fulfillment of the loan's requirement[],' [then] Commerce is normally required to treat the import duty deferrals as contingent liability loans until the liability is met or until the event upon which repayment depends is no longer a viable contingency." MTZ Polyfilms, Ltd. v. United States, 33 CIT 1575, 1583, 659 F. Supp. 2d 1303, 1311 (2009) (citing Loans, 19 C.F.R. § 351.505(d)); see also Def-Inter.'s Suppl. Br. at 3.

The benefit conferred to Içdaş by the GIIS program is, under C.F.R. § 351.505, reasonably understood as a contingent liability.  It is not disputed that Içdaş Elektrik received customs duty and VAT exemptions on certain purchases of machinery and equipment under the GIIS program. Def.'s Br. at 19; Pls.' Br. at 23.  Contrary to Plaintiffs' assertions, the fact that the GOT could

Case 1:19-cv-00150-GSK   Document 27   Filed 02/19/21   Page 27 of 36

Consol. Court No. 19-00149                                                    Page 27
*PUBLIC VERSION*

revoke these exemptions and require payment in full of suspended interest upon discovering issues

at verification is sufficient to render the suspended interest an effective contingent liability loan.

GOT Verification Report at 7-8; <u>see also</u> Def.'s Br. at 20.  Indeed, as Commerce noted, failing to

consider the contingent liability portion of the GIIS benefits would leave it with "no remedy to

restore the subsidies attributed and duties paid."  IDM at 37.

      Here, the regulation defines a contingent liability interest-free loan as a loan for which "the

repayment obligation is contingent upon the company taking a future action or achieving some

goal."  19 C.F.R. § 351.505(d)(1).  The administrative record shows that under the GIIS program,

Içdaş Elektrik received customs duty and VAT exemptions on equipment purchases which were

subject to reclamation with interest in the case that Içdaş Elektrik failed to receive a completion

visa.  PDM at 16 (citing GOT Initial Questionnaire Response (May 14, 2018), P.R. 64, C.R. 36, at

83–84); IDM at 36–37.   Given this evidence, Commerce reasonably determined that Içdaş

Elektrik's repayment obligation was contingent upon grant of the completion visa, and thus that

the GIIS program included "a loan component within the meaning of 19 C.F.R. § 351.505(d)."

IDM at 37; Def.'s Br. at 20.   Because the GIIS program given to Içdaş Elektrik was attributable

to Içdaş, the benefits received under the program were also attributable to Içdaş, and Commerce

reasonably concluded that Içdaş's repayment obligation was contingent upon the company

fulfilling its loan requirements under 19 C.F.R. § 351.505(d).

      Furthermore, it is not contrary to law for Commerce to treat Içdaş's GIIS benefits as both

a contingent liability interest-free loan and a grant.  Under 19 C.F.R. § 351.505(d)(2), if Commerce

"determines that the event upon which repayment depends is not a viable contingency,

[Commerce] will treat the outstanding balance of the loan as a grant received in the year in which

this condition manifests itself."  Here, the contingent liability interest-free loan is not a viable

contingency in the year in which the GOT granted Içdaş a completion visa. Therefore, Commerce

reasonably determined that an additional benefit -- a grant -- arises in the year in which the GOT

waives Içdaş's contingent liability and forgives Içdaş's unpaid VAT and duties. Def.'s Br. at 21.

Nor does the plain language of the statute indicate that 19 C.F.R. § 351.505(d)(2) must be applied

to the exclusion of 19 C.F.R. § 351.505(d)(1),[5] and as noted above, such exclusion risks leaving

Commerce with no recourse to "restore the subsidies attributed and duties paid" through

countervailing duties. IDM at 37. The court therefore concludes that Commerce's decision to

treat the GIIS program as a contingent liability and a grant is supported by substantial evidence

and in accordance with law.

## IV.     *Commerce's Application of the IMF Loan Interest Rates to the Loan Provided Under the GIIS Program is Supported by Substantial Evidence*

Plaintiffs contend that Commerce's decision to apply IMF benchmark loan rates to the

GIIS program is unsupported by evidence and not in accordance with departmental policy. Pls.'

Br. at 26. Setting aside the argument rejected above that the GIIS benefit cannot be characterized

as a contingent loan, Plaintiffs additionally claim that Commerce improperly applied a TL

benchmark rate where Içdaş Elektrik provided actual borrowing rates in U.S. dollars, and that the

IMF TL rates applied were distortive. Id. at 26–27. The Government and RTAC deny these

arguments and contend that, as neither Içdaş nor Içdaş Elektrik had any comparable long-term

loans from commercial banks during the year under consideration or the preceding year,

Commerce properly relied instead on national average interest rates from the IMF statistics. Def.'s

---

[5] In MTZ Polyfilms, the court rejected a similar argument that Commerce improperly interpreted unpaid benefits under an export goods scheme as a contingent liability loan, finding that "in the absence of unambiguous statutory language to the contrary or unreasonable resolution of language that is ambiguous," Commerce's interpretation properly governs. 33 CIT at 1582, 659 F. Supp. 2d at 1313–14.

Br. at 24; Def-Inter.'s Br. at 14.  The court finds that the application of IMF benchmark rates was supported by substantial evidence and in accordance with law.[6]

A loan confers a benefit where there is a "difference between the amount the recipient of the loan pays on the loan and the amount the recipient would pay on a comparable commercial loan that the recipient could actually obtain on the market."  19 U.S.C. § 1677(5)(E).  Under 19 C.F.R. § 351.505(c)(2), to determine the benefit conferred by a government-provided concessionary interest rate loan, Commerce looks to the difference between the actual interest rate and a benchmark rate constituting "the interest the firm would have paid on [a] comparison loan." In the case that the loan is a contingent liability loan, and repayment is conditioned upon an event set to occur more than one year after the receipt of the loan, Commerce is obligated to employ a long-term interest rate benchmark.  19 C.F.R. § 351.505(d).  In order to calculate a long-term interest rate, Commerce "normally will use a loan the terms of which were established during, or immediately before, the year in which the terms of the government-provided loan were established." 19 C.F.R. § 351.505(a)(2)(iii).  However, if Commerce determines that "the firm did not take out any comparable commercial loans" during or immediately before the relevant year, it "may use a national average interest rate for comparable commercial loans."   19 C.F.R. § 351.505(a)(3)(ii).

Here, Commerce appropriately employed a long-term interest rate benchmark to calculate the total benefit received by Plaintiffs under the GIIS.  19 C.F.R. § 351.505(c)(2).  As the court

---

[6] While RTAC further argues that Plaintiffs failed to exhaust their administrative remedies with respect to both Commerce's reliance on IMF data and its application of a tier-three benchmark with respect to natural gas market value, Def.-Inter.'s Br. at 13–14, the court rejects this argument. Plaintiffs have adequately demonstrated that they raised the relevant issues and requested a hearing before Commerce.  See Çolakoğlu and Içdaş Case Brief at 1, 12–15; see also Pls.' Suppl. Br. at 24–25.

found above, one of the benefits conferred by the GIIS program is the suspension of interest on the contingent liability loan provided to Içdaş Elektrik.  As the final waiver of liability through verification and grant of a completion visa could occur years after the issuance of the loan, the GIIS contingent liability loan qualifies as long term under the relevant regulation.  PDM at 18; IDM at 36–37; 19 C.F.R. § 351.505(d).  Thus, the appropriate benchmark for analysis of the total benefit amount is the interest rate provided under a "comparable commercial loan that the recipient could actually obtain on the market."  19 U.S.C. § 1677(5)(E).

Nor is there evidence that Commerce unreasonably applied IMF TL interest rate benchmarks to Plaintiffs.  The applicable regulation clearly states that if Commerce finds that there are no comparable long-term loans it can rely on the national average interest rate.  See 19 C.F.R. § 351.505(a)(3)(ii).  In this case, Commerce concluded that the actual long-term interest rates obtained by Içdaş and Içdaş Elektrik during the relevant period were inappropriate for its analysis because the variable interest rates actually obtained were "set at the time the loans were opened," and thus reflect only "the financial reality of the company at that time."  IDM at 37.  In addition, the provided rates were in U.S. dollars, and thus could not reflect the cost of borrowing TL during the relevant period, while "had Içdaş paid the exempted duties, it would have paid the duties in TL, not USD." IDM at 37; see also Def-Inter.'s Br. at 10.

Indeed, the court has previously sustained Commerce's use of IMF national average interest rates for the calculation of contingent-liability loan benefits.  See MTZ Polyfilms, 33 CIT at 1585, 659 F. Supp. 2d at 1313 (upholding reliance on a long term interest rate benchmark where the benefit scheme closed eight years after issuance of the relevant loan, and where plaintiff identified no comparable long-term rupee-denominated loan from a commercial bank obtained during, or immediately before, the year under consideration); see also Usinor Sacilor v. United

States, 19 CIT 711, 737–38, 893 F. Supp. 1112, 1135–36 (1995) (holding that Commerce's decision to rely upon an IMF rate benchmark was "supported by substantial evidence and [] otherwise in accordance with law" where Commerce "adequately explained its reliance upon the IMF rates" and rejected plaintiffs' provided rates as inapposite).  As in <u>MTZ Polyfilms</u> and <u>Usinor Sacilor</u>, Commerce here provided an adequate explanation for its reliance on the IMF data, IDM at 37, and Plaintiffs have not identified sufficient grounds for the court to conclude such reliance was contrary to law or unsupported by substantial evidence.

Nor do Plaintiffs adequately demonstrate that application of the IMF interest rates was distortive.  <u>See</u> Pls.' Br. at 27.  Içdaş argues that, by converting the provided USD import values to TL to apply IMF TL interest rates, Commerce introduced "a second layer of distortion" beyond its rejection of the actual U.S. dollar interest rates Içdaş provided during the investigation.  Pl.'s Br. at 28.  However, as the Government notes, Içdaş does not allege that Commerce's calculations in fact resulted in a subsidy amount in excess of the amount that would have been received if the loan were given as a grant.  Def.'s Br. at 26.  In addition, Commerce clearly explained its decision to rely on the USD customs values for the exempted equipment, noting that "the TL value of the exempted duties . . . would have been based on the USD invoice amount," and thus "the amount of the contingent liability" in TL is dependent on the TL conversion of the USD invoice amount.  IDM at 38.  Thus, the court sustains Commerce's application of IMF TL loan interest rates in its review of the GIIS program.

V.      ***Commerce Properly Measured the Adequacy of Remuneration Pursuant to 19 U.S.C. § 1677(5)(E)(iv) by Relying on Natural Gas Prices Published by the IEA as a Tier-Three Benchmark***

Plaintiffs argue that Commerce inappropriately employed a tier-three benchmark to find that Çolakoğlu received natural gas for less than adequate remuneration.  Pls.' Br. at 29.  Plaintiffs

do not contest Commerce's finding that there was no usable tier-one benchmark for adequate remuneration.   Instead, Plaintiffs assert that Commerce improperly rejected viable tier-two benchmark data by rejecting Plaintiffs' submitted price data from Russia and Azerbaijan.  Id. at 30.   Specifically, Plaintiffs argue that Commerce's reliance on tier-three IEA averages was improper because (1) Commerce provided no evidence for its determination that the proposed tier-two benchmark countries exercise "outsized control" over the natural gas market, and therefore provide distorted price data, and (2) Commerce itself distorted the tier-three price data by cherry-picking market participant gas prices.  Id. at 32–33, 37.  The Government and RTAC respond that Çolakoğlu provides no evidence contradicting Commerce's finding that Russian and Azerbaijani gas prices were unviable as a tier-two benchmark.  Def.'s Br. at 37; Def-Inter.'s Br. at 16.  The court finds that Commerce's rejection of the proposed tier-two benchmark, and reliance on a tier-three benchmark, was in accordance with law and supported by substantial evidence.  In addition, the court holds that Commerce reasonably interpreted 19 C.F.R. § 351.511 in the development of the tier-three benchmark.

### A.   Commerce's Tier-Two Determination

In its Final Results, Commerce found that Russian and Azerbaijani domestic natural gas prices are distorted by government control, and that natural gas exports from those countries necessarily reflect these distorted prices.  IDM at 17–18.  Thus, Commerce concluded that neither domestic nor export prices from Russia or Azerbaijan were viable tier-two benchmarks.  Id.  In support of this conclusion, Commerce cited both its prior investigations relating to Russian and Azerbaijani export prices.  Id. at 18 (citing Preliminary Results; Steel Concrete Reinforcing Bar From the Republic of Turkey, 82 Fed. Reg. 57,574 (Dep't of Commerce December 6, 2017).

Commerce's rejection of the proposed Russian benchmark data was supported by substantial evidence and in accordance with law.  Commerce has consistently found that Russian natural gas export prices to the EU were distorted and unsuitable as a benchmark.  See, e.g., Countervailing Duty Investigation of Certain Cold-Rolled Steel Flat Products from the Russian Federation: Final Affirmative Countervailing Duty Determination and Final Negative Critical Circumstances Determination, 81 Fed. Reg. 49,935 (July 29, 2016); PDM at 22.  Additionally, the court has repeatedly sustained such findings.  See, e.g., Rebar Trade Action Coal. v. United States II, 43 CIT __, __, 398 F. Supp. 3d 1374, 1378–79 (2019).  In particular, the court has held that "it is reasonable . . . for Commerce to predicate its determination that Russian export prices are not market-driven based on a pattern of abusing its 'dominant market position in support of foreign policy goals.'"  Habaş Sınai ve Tıbbi Gazlar İstihal Endüstrisi A.Ş. v. United States, 44 CIT __, __, 459 F. Supp. 3d 1341, 1350 (2020) (quoting Remand Results at 16–17 & n.74).  Commerce does not, as Plaintiffs suggest, find that Russia "somehow . . . control[s] overall market prices," Pls.' Br. at 32, but rather draws a reasonable conclusion from the available evidence.  Thus, the court sustains Commerce's determination.

The court similarly sustains Commerce's rejection of the proposed Azerbaijani export data. Commerce concluded in its Final Results that, given Turkey's distorted domestic natural gas market, Azerbaijani natural gas export prices are likewise distorted by participation in the Turkish market.  IDM at 18.  Although Plaintiffs suggest this finding "amounts to a blanket repudiation of 19 C.F.R. § 351.511(a)(2)(ii)," Pls.' Br. at 32, the existence of a tier-three benchmark in fact "anticipates situations where the government intervenes, such that it is the only source available to consumers in that country."  Nucor Corp. v. United States, 42 CIT __, __, 286 F. Supp. 3d 1364, 1379 (2018) (citing CVD Preamble, 63 Fed. Reg. at 65,378).  In addition, while Plaintiffs claim

that Commerce's determination was based on "mere speculation," Pls.' Br. at 32–33, Commerce is permitted to make reasonable inferences from the record evidence. Daewoo Elecs. Co. v. United States, 6 F.3d 1511, 1520 (Fed. Cir. 1993). Here, Commerce reasonably determined that the Turkish natural gas market is distorted by GOT control, and that Azerbaijan's exports to Turkey are necessarily "in conformity with the Turkish market," such that neither domestic nor export prices in Azerbaijan reflect undistorted tier-two benchmark data. IDM at 18.

Plaintiffs fail to demonstrate that Commerce's rejection of the proposed tier-two benchmarks was improper or contrary to the record evidence. The court therefore finds that Commerce's determination that Russia and Azerbaijan did not provide viable tier-two benchmark data was supported by substantial evidence and in accordance with law.

### B.   Commerce's Tier-Three Calculations

In the Final Results, Commerce employed a tier-three benchmark in its analysis of adequate remuneration. Commerce explained that it constructed the tier-three benchmark "based on IEA pricing data for EU countries, adjusted for Russian exports to the EU" during the relevant period, such that the benchmark provided as accurate an accounting of gas sales for less than adequate remuneration as possible. IDM at 17. In particular, the benchmark incorporated "all data available for EU countries on the record," including data from "both IEA submissions [and] the natural gas prices for electricity generation, as proposed by Çolakoğlu." IDM at 19.

Plaintiffs argue that if a tier-three benchmark is used, it should be based on the overall average of IEA data for all EU countries, rather than limited data controlled for Russian exports. Pls.' Br. at 38. In particular, Çolakoğlu asserts that the IEA data used is not representative of the EU market given its exclusion of Norway and Russia. Id. at 34. Plaintiffs argue that Commerce essentially cherry-picked the IEA data such that the resultant benchmark is "not representative" of

the market value of natural gas.  Id. at 34–35.  The Government and RTAC respond that the

unmodified IEA data could not have substantiated a market value determination, as Russian natural

gas pricing is distorted by state involvement, and that Commerce in fact relied upon all EU IEA

data in the record when reaching its final determination.  IDM at 19; Def.'s Br. at 40–41; Def.-

Inter.'s Br. at 18–19.

      As noted above, the court has consistently sustained Commerce's reliance on IEA data in

constructing a natural gas benchmark.  See Rebar Trade Action Coalition v. United States I, 43

CIT __, __, 389 F. Supp. 3d 1371 (2019); see also Habaş, 459 F. Supp. 3d 1341.  Furthermore, the

court provides substantial deference to Commerce in "identifying, selecting, and applying its CVD

methodologies."  Habaş, 459 F. Supp. 3d at 1353; see also Fujitsu, 88 F.3d at 1039.  Even where

Commerce's explanation is "'of less than ideal clarity,'" the court is obligated to "sustain a

determination . . . where Commerce's decisional path is reasonably discernable."  Rebar I, 389 F.

Supp. 3d at 1381–82 (quoting Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co., 463

U.S. 29, 43 (1983)).  The question is not whether some other inference could reasonably have been

drawn, but if the record as it stands adequately supports Commerce's determination.  Id. at 1384–

85 (citing Daewoo, 6 F.3d 1511, 1520 (Fed. Cir. 1993)).  The court is not tasked with determining

whether Commerce could have improved the data it relied upon.  Id.  Indeed, it is established that

"[a]ntidumping and [CVD] determinations involve complex economic and accounting decisions

of a technical nature, for which agencies possess far greater expertise than courts."  Fujitsu, 88

F.3d at 1039.  Thus, so long as Commerce's determination is reasonable, the court must uphold it.

      Plaintiffs' argument is therefore unavailing.  Here, as the Government notes, the aim of the

tier-three analysis was not to precisely "estimate the price of natural gas in Europe, but to

determine the market value for natural gas as consumed in Turkey, relying on what data are

available on the record." Def.'s Br. at 38–39 (quoting IDM at 19); see also Def-Inter.'s Br. at 18.

Commerce clearly explained its methodology in arriving at the tier-three benchmark, and Plaintiff

has not demonstrated that the record cannot reasonably be construed to support Commerce's

determination. IDM at 17–19. Accordingly, the court finds that Commerce reasonably measured

the adequacy of remuneration pursuant to 19 U.S.C. 1677(5)(E)(iv) by relying on IEA natural gas

prices to constitute as a tier-three benchmark.

## CONCLUSION

The court finds that Commerce's final determination was in accordance with law and

supported by substantial evidence. In particular: (1) Commerce permissibly applied partial AFA

in response to Içdaş's failure to cooperate with Commerce's investigation to the best of its ability;

(2) Commerce reasonably attributed to Içdaş the GIIS program benefits received by Içdaş Elektrik

as a cross-owned input supplier; (3) Commerce reasonably interpreted Içdaş's customs duty and

VAT exemptions as both a grant and a contingent liability; (4) Commerce's application of an IMF

TL loan interest rate benchmark with respect to the GIIS's interest-free contingent liability was

appropriate under 19 U.S.C. § 1677(5)(E); and (5) Commerce permissibly resorted to a tier-three

benchmark for the market price of LNG in its assessment of adequate remuneration.

Accordingly, Plaintiffs' motion for judgment on the agency record is denied; Commerce's

Final Results are sustained, and judgment is entered in favor of the United States.

**SO ORDERED.**

/s/  *Gary S. Katzmann*
 Gary S. Katzmann, Judge


 Dated:  February 19, 2021
          New York, New York